# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DIANA K. McDONALD,           :

      Plaintiff,           :

                                 Case No. 3:14cv00408

  vs.                    :

                                 District Judge Walter Herbert Rice

CAROLYN W. COLVIN,      :    Chief Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,      :

      Defendant.         :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    Introduction

In 2011, Plaintiff Diana K. McDonald underwent hip-replacement surgeries, first in her right hip and later in her her left hip. She still has pain in her hips and other significant health problems. She brings this case challenging the Social Security Administration's denial of her application for Disability Insurance Benefits. She contends that she is eligible for benefits because there is no evidence showing she can perform more than sedentary work after she turned age 50.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

record (Docs. #6), and the record as a whole.

II.     **Background**

        A.      **Plaintiff and Her Administrative Proceedings**

        Plaintiff protectively applied for Disability Insurance Benefits when she was age

49.  She asserted that her disability began on April 18, 2011, near the date of her first hip-

replacement surgery.  She later asked to amend her disability onset date to March 1, 2009.

(Doc. #6, *PageID* #36).

        In February 2012, Plaintiff turned age 50.  She thus became a person "closely

approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. §

404.1563(d).  She has a high school education.  She has worked as a fast-food cook and a

pharmacy technician.

        When Plaintiff filed her application for Disability Insurance Benefits, a disability

examiner initially approved it, in part, finding that Plaintiff's benefits-qualifying disability

began on a specific date in February 2012, when she was age 50.  (Doc. #6, *PageID* #s

112-13).  Upon reconsideration, her application was partially approved (by a different

examiner) with the disability onset date.  *Id*. at 161.  Because Plaintiff believed that she had

been under a benefits-qualifying disability starting well before February 2012, she filed a

written request for a hearing.

        Plaintiff's request for a hearing was granted.  Additional medical evidence was

gathered and the matter proceeded to hearing before Administrative Law Judge John S.

Pope who later issued a written decision. ALJ Pope concluded that Plaintiff had not been under a disability since March 1, 2009. Doing so, the ALJ denied Plaintiff's application for Disability Insurance Benefits, effectively negating the finding upon initial administrative review and reconsideration that she been under a disability starting on February 6, 2012. *See* Doc. #6, *PageID* #52.

### B. Plaintiff's Hearing Testimony

Plaintiff testified that she last worked in 2009. At that time, she worked 2 jobs but was dismissed from 1. She had to quit the other due to her hip problems and swelling in her legs from standing. (Doc. #6, *PageID* #63). She testified that the pain in her right hip started in 2009 and was a sharp, burning pain. *Id*. at 90. She experienced this pain ½ of the time. She also had pain in her lower back. "It would bring me to my knees it would hurt so bad," she explained. *Id*. at 91. The pain would extend to her right leg and ankle. She had this pain over ½ of the time. It worsened with physical activity. *Id*. at 92.

Soon after her last job in 2009, Plaintiff attempted to return to work as a taxi cab dispatcher. She was unable to do the dispatcher job because she could not sit and stand, presumably as the job required. *Id*. at 65.

In 2009, Plaintiff had difficulty with standing, walking, and sitting. Sitting was more difficult than standing. She also had difficulty lifting and carrying things. *Id*. at 67.

Plaintiff estimated that in a typical 8-hour day, she can walk about an hour and a half, stand "maybe" 10 to 15 minutes at a time, and can sit for about ½ hour to 45

minutes at a time.  *Id*. at 92-93.  Her typical day consists of household chores and resting.
*Id*. at 74.  She dusts but then must sit down for a while and elevate her legs due to
swelling.  *Id*. at 73.  She needs to take breaks to lie down and rest about 3 to 4 hours every
day.  *Id*. at 75.  Her daughter cooks dinner and helps with laundry and grocery shopping.
She also helps Plaintiff put on her socks and shoes.  Plaintiff had difficulty doing this
without help because she could not bend over much.  *Id*. at 76-77.  She is able to drive but
has trouble using the pedals with her right leg.  *Id*. at 94.

     **C.**    <u>**Medical Evidence**</u>

     In February 2012, Plaintiff's primary treating physician Dr. Brunsman completed a
form titled, "Multiple Impairment Questionnaire."  (Doc. #6, *PageID* #s 1304-1312)
(capitalization omitted).  He diagnosed Plaintiff with degenerative disc disease in her
lumbar spine, multiple joint osteoarthritis, spondylosis in her lumbar spine, sacrolitis, and
depression.  Dr. Brunsman believed that her prognosis was poor.

     Dr. Brunsman reported that Plaintiff's clinical findings included decreased range of
motion in her hips bilaterally and in her lower back.  He also reported that Plaintiff was
tender to palpation of her lower back and sacroiliac joints.  *Id*. at 1305.  Laboratory and
diagnostic techniques that support Dr. Brunsman diagnoses included CT scans of
Plaintiff's lumbar spine and x-rays of her lumbar spine, knees, and hips.  *Id*. at 1306.  Dr.
Brunsman identified Plaintiff's primary symptoms as back pain, hip pain, and numbness in
her left leg and her right greater trochanter.  Dr. Brunsman noted that the pain in Plaintiff's

back, both hips, and left knee was constant, throbbing, and severe.  *Id*.  At times, according to Dr. Brunsman, Plaintiff would experience episodes of worsening pain with the precipitating factors of walking and light lifting.  He estimated that Plaintiff's pain level rated as moderately severe to severe (7 on a 10-point).  *Id*. at 1307.  He assessed Plaintiff's fatigue as moderate (4 on a 10-point scale).

Dr. Brunsman opined that Plaintiff was limited to sitting for zero to 1 hour total in an 8-hour workday and standing/walking zero to 1 hour total in an 8-hour workday.  *Id*.  When sitting, she needed to get up and move around every 10 to 15 minutes and not sit again for 5 minutes.  *Id*. at 1307-08.  She could frequently lift/carry up to 5 pounds and occasionally lift/carry from 5 to 10 pounds, but never more.  *Id*. at 1308.

Dr. Brunsman believed that Plaintiff's symptoms were likely to increase in a competitive work environment.  *Id*. at 1309.  He reported that she "has irritability due to chronic pain [and] can be withdrawn."  *Id*. at 1310.  He further reported, "Chronic pain pathology continuously feeds into depressive emotional state."  *Id*.  Dr. Brunsman noted that Plaintiff was not a malingerer.  He further opined that Plaintiff needed unscheduled breaks to rest every 1 to 2 hours during an 8-hour workday for 10 minutes each time.  *Id*.  He noted that Plaintiff's impairments would likely produce good days and bad days, and she would be absent from work, on the average, more than 3 times a month as a result of her impairments or treatment.  *Id*. at 1311.

Dr. Brunsman stated that the symptoms and limitations he described in the

questionnaire had been present since March 2009.  *Id*. at 1311.  He lastly reported that Plaintiff had undergone arthroplasty on her right hip in April 2011 and on her left hip in October 2011.  *Id*.

In a March 2012 letter, Dr. Brunsman described Plaintiff as a patient he had been seeing for several years.  He continued:

> She was initially seeing me for arthritis and degenerative symptoms in her lower back.  This was giving her chronic pain.  CT scan ultimately confirmed spondylosis and herniated disc.
>
> [Plaintiff] was later found to have degenerative arthritis in multiple joints.  In particular, there was her left hip which required hip replacement surgery in 2011....

(Doc. #6, *PageID* #1334).  After providing further information about Plaintiff's treatment, Dr. Brunsman opined:

> Patient's disability and inability to work is due mainly to the arthritis and chronic pain.  As far as I know, she has not worked since early 2010.  She is currently unable to work and I do not anticipate she will ever be able to work full time [sic] work part time.

*Id*.

The administrative record contains many additional medical records, including non-treating medical source opinions.  A detailed description of those records and opinions is unnecessary because the undersigned has reviewed the entire administrative record and because Plaintiff's counsel has accurately summarized the relevant records with citations to specific evidence.  Additionally, both the Administrative Law Judge and the Commissioner refer to particular evidence with citations.

6

## III.   **"Disability" Defined and the ALJ's Decision**

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – *i.e.,* "substantial gainful activity," in Social Security lexicon.[2]  42 U.S.C. § 423(d)(1)(A); *see Bowen*, 476 U.S. at 469-70.

To determine whether Plaintiff was under a benefits-qualifying disability, ALJ John S. Pope applied the Social Security Administration's 5-Step sequential evaluation procedure, *see* 20 C.F.R. § 404.1520(a)(4), concluding, in the main:

1.    Plaintiff meets the Social Security Act's insured-status requirements through December 31, 2014, and she had not engaged in substantial gainful activity since March 1, 2009.

2.    She has the severe impairments of "degenerative disc disease of the lumbar spine, osteoarthritis of the bilateral hips and bilateral knees, status post bilateral hip replacement, obesity, chronic obstructive pulmonary disease (COPD), hypertension, depression, anxiety, and polysubstance abuse in reported remission."  (Doc. #6, *PageID* #38)(citation omitted).

3.    Her impairments or combination of impairments did not meet or medically equal the severity of one in the Commissioner's Listing of Impairments.  *Id*.

---

[2] In addition, the impairment must be one "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

7

at 39.

4.     Despite Plaintiff's impairments, she could perform light work "except that
       she may lift/carry twenty pounds occasionally, ten pounds frequently; she
       may stand/walk only four hours in an eight-hour day; sit six hours in an
       eight-hour day; she may only frequently stoop; occasionally climb ramps and
       stairs and kneel; never climb ladders, ropes, or scaffolds, crouch, or crawl;
       she must avoid all exposure to hazards; and she is limited to no more than
       occasional decision-making or changes in the work environment and simple,
       repetitive three to four-step tasks; she is able to be around other employees
       throughout the workday, but she is capable of only occasional conversations
       and interactions." *Id*. at 40.  Plaintiff could not perform her past relevant
       work.  *Id*. at 51.

5.     Plaintiff can perform a significant number of jobs that exist in the national
       economy.  *Id*. at 51-52.

The sum and substance of the ALJ's sequential evaluation ultimately led her to

conclude that Plaintiff was not under a benefits-qualifying disability.

**IV.   <u>Judicial Review</u>**

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ

applied the correct legal standards and whether the findings of the ALJ are supported by

substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir.

2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or

disagrees with the ALJ's factual findings or by whether the administrative record contains

evidence contrary to those factual findings.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708,

722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met –

that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a

conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d

387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of

evidence but less than a preponderance ... " *Rogers*, 486 F.3d at 241; *see Gentry*, 741 F.3d

at 722.

The second line of judicial inquiry – reviewing the ALJ's legal criteria for

correctness – may result in reversal even when the record contains substantial evidence

supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651

(6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence,

'a decision of the Commissioner will not be upheld where the SSA fails to follow its own

regulations and where that error prejudices a claimant on the merits or deprives the

claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478

F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir.

2004)).

V.     **Discussion**

    A.     **Medical Source Opinions**

Plaintiff contends that the ALJ failed to properly weigh the opinions of her treating

physician Dr. Brunsman. She reasons, in part, that the ALJ (1) failed to identify substantial

evidence contradicting Dr. Brunsman's opinions, (2) erred by suggesting that Dr.

Brunsman's opinions are questionable because Plaintiff asked the doctor to provide

opinions on her medical condition, and (3) erred in not placing controlling weight on Dr. Brunsman's opinions.  Plaintiff, moreover, argues that application of the factors in the regulations required the ALJ to adopt Dr. Brunsman's opinions.

The Commissioner argues that the ALJ articulated at least one good reason for placing little weight on Dr. Brunsman's opinions.  The good reason that the Commissioner and the ALJ rely on was the internal inconsistency in Dr. Brunsman's opinions about Plaintiff's lifting ability.  The Commissioner further maintains, in part, that Plaintiff largely sidesteps the ALJ's reasoning that Dr. Brunsman's opinion about her extreme and constant limitations since March 20009 "conflicted with Plaintiff's reports in mid-2010 and beyond of success in school, of engaging in taxing activities, and of part-time work."  (Doc. #11, *PageID* #1501).

Social security regulations build a hierarchy of medical sources opinions based largely on the type of relationship a medical source has with the applicant for social security.  From top to bottom, the regulations characterize medical sources as treating physicians or psychologists, nontreating yet examining physicians or psychologists, and nontreating/record-reviewing physicians or psychologists.  *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).  The source of the opinions provided by a physician or psychologist "dictates the process by which the Commissioner accords it weight."  *Id*.

Treating medical sources's position at the top of the hierarchy is reflected in the

10

treating physician rule.  *See Gayheart*, 710 F.3d at 375; *see also Rogers*, 486 F.3d at 242.

The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record."

*Gayheart*, 710 F.3d  at 376 (quoting 20 C.F.R. §404.1527(c)(2)); *see Gentry*, 741 F.3d at

723.  If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

As to non-treating medical sources, the regulations require ALJs to weigh their

opinions "based on the examining relationship, (or lack thereof), specialization,

consistency, and supportability, but only if a treating-source opinion is not deemed

controlling."  *Gayheart*, 710 F.3d  at 376 (citing 20 C.F.R. §404.1527(c)).

In Plaintiff's case, the ALJ gave "little weight" to the opinions provided by

Plaintiff's treating physician Dr. Brunsman for many reasons.  He concluded that Dr.

Brunsman's opinions were internally inconsistent because Dr. Brunsman believed that

Plaintiff could stand/walk less than 1 hour in an 8-hour workday but also believed she

needed to stand/walk for 5 minutes every 10 to 15 minutes, or a total of 160 minutes per

11

day.  This was, in the ALJ view, inconsistent because the latter opinion totaled more than 1 hour of standing/walking.  The ALJ also found inconsistency between Dr. Brunsman's opinion that Plaintiff was limited to lifting/carrying up to 10 pounds and his statement that Plaintiff cannot lift.  (Doc. #6, *PageID* #47 (citing Exhibit 18F)).  The ALJ further concluded that Dr. Brunsman's opinions were inconsistent with his treatment notes concerning Plaintiff and "the overall evidence in the record ...." *Id*. at 48.  And the ALJ noted that Plaintiff had worked at least 1 part-time job after beginning treatment with Dr. Brunsman, which he included in his treatment notes.

The ALJ's evaluation of Dr. Brunsman's opinions is problematic in many respects. The ALJ's evaluation is flawed because he merely identified a mixed bag of reasons for placing little weight on Dr. Brunsman's opinions.  There is no indication in the ALJ's decision that he applied the correct legal criteria under the treating physician rule, which is "at the heart of this regulation."  *Gayheart*, 710 F.3d at 377 (referring to 20 C.F.R. §404.1527(c)(2)).  By merely listing reasons for placing little weight on Dr. Brunsman's opinions, the ALJ skipped over the primary status treating physicians generally have in patient care and under social security regulations.  The Regulations explain to applicants:

> Generally, we give more weight to the opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment[s] and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations....

20 C.F.R. §404.1527(c)(2)[3]; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The ALJ's list of reasons, moreover, unmoors the ALJ's decision not only from the criteria applicable under the treating physician rule, but also from the regulation's mandatory requirement that when the treating physician rule does not apply, ALJs must continue to weigh a treating medical source's opinions under additional factors. The problem here is not that the ALJ failed to refer to the regulatory factors – he did, after all, fault Dr. Brunsman's opinions for lack of support in his treatment notes and certain inconsistencies. The problem is that the ALJ's mixed bag of reasons without reference to, or consideration of, the treating physician rule, fails to indicate that the ALJ considered, "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4 ('In many cases, a treating physician's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.')." *Rogers*, 486 F.3d at 242. In other words, the ALJ weighed Dr. Brunsman's opinions under the same legal criteria applicable to opinions provided by medical sources holding lower status on the regulation's hierarchy of medical source opinions. This constituted error.

The ALJ's next misstep occurred when he identified internal inconsistencies in Dr.

---

[3] The Social Security Administration has re-lettered 20 C.F.R. §404.1527 without altering the treating physician rule or other legal standards. *See Gentry*, 741 F.3d at 723. The re-lettered version applies to decisions, like the ALJ's, issued on or after April 1, 2012.

Brunsman's opinions that are either insignificant or nonexistent. The ALJ's use of arithmetic to fault as inconsistent Dr. Brunsman's opinion about Plaintiff's ability to stand/walk for up to 1 hour in an 8-hour workday versus her need to stand/walk for 5 minutes every 10 to 15 minutes, or a total of 160 minutes per day. The ALJ, however, did not recognize that the question posed to Dr. Brunsman required his "estimate" of Plaintiff's abilities. (Doc. #6, *PageID* #1307). Given this, the arithmetic difference the ALJ identified does not expose error or a significant internal inconsistency within Dr. Brunsman's opinions.

The ALJ also faulted Dr. Brunsman's opinion about Plaintiff's ability to occasionally lift/carry up to 5-10 pounds and frequently lift/carry 0-5 pounds because Dr. Brunsman also wrote that Plaintiff "cannot lift." *Id*. at 1308. The ALJ, however, viewed Dr. Brunsman's "cannot lift" comment out of context. Immediately after Dr. Brunsman provided his opinions about Plaintiff's very limited lifting/carrying abilities, he was asked, "Does your patient have significant limitations in doing repetitive reaching, handling, fingering or lifting?" *Id*. Answering, "cannot lift," to this question, means Dr. Brunsman thought that Plaintiff cannot lift "repetitively," as the question asked. Lifting/carrying "repetitively" often suggests, if not literally means, that the lifting/carrying repeatedly at or near the same time. It was therefore not inconsistent for Dr. Brunsman to believe that Plaintiff can't repeatedly lift/carry any amount of weight but could occasionally or frequently lift/carry minimal amounts of weight.

14

Another reason the ALJ provided for discounting Dr. Brunsman's opinions ventured

into cynical territory.  The ALJ explained:

> [A]nother reality that should be mentioned is that patients can be quite
> insistent and demanding in seeking supportive notes or reports from their
> physicians, who might provide such a note to satisfy these requests and avoid
> unnecessary doctor/patient tension.  While it is difficult to confirm the
> presence of such motives, they are more likely in situations where the
> opinion in question departs substantially from the rest of the evidence of
> record, as in the current case.  In the present case, Dr. Brunsman
> acknowledges in his treatment notes from February 8, 2012, the date of this
> opinion, that the claimant provided the doctor with a 'very large form sent
> here by her attorney' and she stated that she had come for the purpose of
> going over and evaluating the form (Exhibit 19F).  In the 'plan' section of the
> treatment note, Dr. Brunsman, for the first time in his three-year treatment
> history with the claimant, stated that he did not thinks the claimant was
> employable and would not be in the foreseeable future (Exhibit 19F).  This is
> the first time Dr. Brunsman made any comment regarding the claimant's
> work status or functional ability, and it was made directly in response to the
> claimant's request....

*Id*. at 47.  The ALJ's view of "reality" ignores or overlooks the fact that Dr. Brunsman was

bound by training, medical licensing, and professional ethics to provide truthful and

accurate information about his opinions.  It his highly unlikely that Dr. Brunsman would

risk damage to his professional reputation and medical license, by expressing a particular

medical opinions that Plaintiff wanted rather than the medical opinions he actually held.  In

addition, the record contains no evidence tending to show that Dr. Brunsman altered his

genuinely held opinions at Plaintiff's request.  The regulations, moreover, actively

encourage social security applicants to obtain opinions from their treating medical sources.

As the Seventh Circuit has explained:

15

>    [T]he fact that relevant evidence has been solicited by the claimant or
> her representative is not a sufficient justification to belittle or ignore that
> evidence.  Quite the contrary, in fact.  The claimant bears the burden of
> submitting medical evidence establishing her impairments and her residual
> functional capacity. 20 C.F.R. §§ 404.1512(a), (c), 404.1513(a), (b),
> 404.1545(a)(3).  How else can she carry this burden other than by asking her
> doctor to weigh in?  Yet rather than forcing the ALJ to wade through a
> morass of medical records, why not ask the doctor to lay out in plain
> language exactly what it is that the claimant's condition prevents her from
> doing?  Indeed the regulations endorse this focused inquiry. *See id*. §
> 404.1513(b)(6) (requesting from claimant "a medical source statement about
> what you can still do despite your impairment(s)"); *id*. § 404.1545(a)(3) ("We
> will consider any statements about what you can still do that have been
> provided by medical sources...."); *see also id*. (permitting claimant to submit
> "descriptions and observations" about her functional limitations from
> "family, neighbors, friends, or other persons".  And in the "Best Practices"
> section of its website, the Social Security Administration recognizes the
> value of this approach by urging claimants and their representatives to submit
> a doctor's statement that explicitly "identifies the limitations imposed by the
> claimant's impairments...."[4]

*Punzio v. Astrue*, 630 F.3d 704, 712-13 (7th Cir. 2011) (footnote added) (case citations

omitted).  At the very least, it is ingenious for the ALJ to criticize a treating physician's

opinion on the ground that the applicant asked for such opinion, while the ALJ relied on

state-agency physicians' opinions without finding fault in their government-paid status.

    The ALJ also found the opinions from Dr. Brunsman not supported because they

were provided after Plaintiff's hip surgery.  Dr. Brunsman's records show that he knew

about Plaintiff's hip surgery and that she had experienced some improvement.  Despite

this, Dr. Brunsman still found that Plaintiff's impairments prevented her from working.  He

---

[4] (quoting *See Best Practices for Claimants' Representatives*, SOCIAL SECURITY ONLINE,
http://www.socialsecurity.gov/appeals/best_practices.html (last visited Dec. 21, 2010).

explained, moreover, that his opinions were based on clinical evidence of decreased range of motion in the hips and lower back, tenderness of the lower back and sacroiliac joints, and diagnostic CT scans findings of the lumbar spine and x-rays of the lumbar spine, knees, and hips. (Doc. #6, *PageID* #s 1305-06). Therefore, his opinions are based on appropriate clinical and diagnostic testing and cannot be reasonably discounted on the ground that his opinions post-dated Plaintiff's hip-replacement surgeries.

Turning to the fact that Plaintiff performed some part-time work after her claimed disability onset date does not constitute substantial evidence supporting the ALJ's decision to place little weight on Dr. Brunsman's opinions. As the ALJ found, the work itself was not considered substantial gainful activity. *Id.* 38. If the opposite had been true, if Plaintiff had engaged in substantial gainful activity after her disability onset date, she would not be entitled to benefits at Step 1 of the sequential evaluation. *See* 20 C.F.R.§404.1520(a)(4)(i). The Commissioner counters that this is irrelevant in light of Plaintiff's abilities to engage in certain activities since 2009. The Commissioner contends that the ALJ noted, "Plaintiff reported in counseling in May 2010 that she worked two part time jobs and in December 2011 that she helped a friend move and got a B on a test in school for medical records and billing." (Doc. #11, *PageID* # 1501 (citing *PageID* #s 50, 376, 425, 428). The counseling notes referred to by the Commissioner do not provide any information about the 2 part-time jobs Plaintiff was working. The notes do not mention what type of work it involved or how many hours a week Plaintiff was working. (Doc. #6, *PageID* #s 362, 376). These

17

omissions are significant because of the wide range of weekly hours that may qualify as a part-time job working, even a job involving very few hours a day or week may qualify as a part-time job.  One notes mentions that she was babysitting her granddaughter but fails to indicate how often or how many hours she babysat at a time or each week.  *Id*. at 362.  As to Plaintiff's B grade on a test and the fact that she was going to school for medical records and billing, the records where this information appears provide no further information. A test may widely range in difficulty depending on the subject matter and amount of information tested.  For instance, a test given early in a course will likely be far simpler than a final exam.  Without more information about the test Plaintiff took, no reasonable inference can be drawn from her B grade.  *Id*. at 425.  Informative details are also missing from the comment that Plaintiff was going to school for medical records and billing.  Was she going to school full or part time?  How many courses or hours of coursework was she taking?  How far had Plaintiff progressed in her study of medical records and billing?  *Id*. at 428.  Without answers to such questions, which these records do not provide, it is not reasonable to conclude that these activities conflicted with Dr. Brunsman's opinions.  The Commissioner also argues, "And, perhaps most revealingly, Plaintiff told Dr. Brunsman himself in May 2010 that she still worked as a dispatcher and in June 2010 that she had been unable to work at a *second job*."  (Doc. #11, *PageID* #1501 (citing *PageID* #s 1379, 1385) (italics in original)).  Examination of these notes does not help the Commissioner.  The references to Plaintiff as unable to work a second job and that she worked as a

18

dispatcher are consistent with her prior statement in counseling that she was working 2 part-time jobs.  Dr. Brunsman's treatment notes provide no further information about the type of work Plaintiff was doing or how many hours she worked at each job.  (Doc. #6, *PageID* #s 1379, 1385).  Moreover, the fact that she was not able to work at her second job appears to have been due to increased back pain.  This tends to support, rather than detract from, the validity of Dr. Brunsman's opinions.

In sum, Plaintiff's challenges to the ALJ's evaluation of Dr. Brunsman's opinions are well taken.[5]

### B.    Remand is Warranted

Plaintiff contends that the Commissioner's final decision be reversed and the matter be remanded for an award of benefits is warranted. Plaintiff explains, "As there is no evidence Plaintiff can do more than sedentary work, [she] should be found disabled from her 50th birthday and the evidence re-evaluated pursuant to the Commissioner's Regulations for the period between the onset and [Plaintiff's] 50th birthday."  (Doc. #7, *PageID* at 1486).

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right.  *Bowen*, 478 F3d at 746.  Remand is warranted for an ALJ's failure to follow the

---

[5] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's remaining arguments is unwarranted.

regulations, for example, when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson,* 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff to lack credibility, *Rogers*, 486 F.3d at 249.

Under sentence 4 of 42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is weak. *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A remand for an award of benefits before Plaintiff turned age 50 is unwarranted because the evidence of her disability before age 50 is not overwhelming and because the evidence of her disability before age 50 is not strong while contrary evidence is weak. *See Faucher*, 17 F.3d at 176. Yet, Plaintiff is entitled to an Order reversing, in part, the ALJ's decision concerning her disability status upon turning, and continuing after she turned, age 50. Regardless of whether controlling weight was due Dr. Brunsman's opinions, his

opinions constitute strong evidence that Plaintiff was under a disability beginning on age 50. Evidence to the contrary is weak.

The factors applicable to treating source opinions favor placing deferential weight on Dr. Brunsman's opinions, particularly when his opinions are compared to the opinions of the non-treating, record-reviewing medical sources. Dr. Brunsman treated Plaintiff regularly since May 2009. The nature of the treatment he provided concerned Plaintiff's physical impairments – for example, multiple-joint osteoarthritis, spondylosis in her lumbar spine, and degenerative disc disease in her lumbar spine. Dr. Brunsman supported Plaintiff's opinions with positive clinical finding including decreased range of motion in her hips, bilaterally, and in her lower back; and tenderness to palpation of her lower back and sacroiliac joints. (Doc. #6, *PageID* 1302). He also relied on the result of objective medical testing, including a CT of her lumbar spine and x-rays of her lumbar spine, hip, and knee. And Dr. Brunsman's findings are consistent with the treatment notes, diagnostic testing, and reports from the treating and examining specialists.

Dr. Brunsman's opinion that Plaintiff's impairments would produce both good and bad days for her. (Doc. #6, *PageID* #1311). He further opined that on the average, Plaintiff is likely be absent from work more than 3 times per month. *Id*. And, considering a 0 to 10 scale (0 = the least painful level; 10 = most painful), he thought that on good days, Plaintiff's pain level would be 7 and on bad days 9. *Id*. at 1307. The vocational expert testified that if a person was absent from work on average more than 1 day per month, the excess absences would preclude competitive full-time employment. *Id*. at 103.

21

Dr. Hinzman's record review led him to conclude that Plaintiff was under a disability beginning on February 6, 2012. *Id*. at 127. This disability onset date was at or very near the date Plaintiff underwent her first hip-replacement surgery. Dr. Gorniak also reviewed the record and concluded that Plaintiff was under a disability beginning on February 6, 2012. *Id*. at 160. These aspects of the opinions provided by Dr. Hinzman and Dr. Gorniak were consistent with Dr. Brunsman's disability opinion to the extent each of these physicians believed Plaintiff was under a disability beginning on February 6, 2012. Although the ALJ is not bound by a medical source's opinion that an applicant is under a disability, 20 C.F.R. §404.127(d)(1), the fact the these 3 physicians found Plaintiff to be under a disability beginning on February 6, 2012 constitutes strong evidence of disability while contrary evidence is weak. In contrast, evidence between Plaintiff's claimed disability onset date of April 11, 2011 to February 6, 2012 remains in dispute.

In sum, this matter should be remanded to the Social Security Administration pursuant to sentence 4 of §405(g) due to the problems set forth above. On remand the ALJ should be directed to review Plaintiff's disability claim to determine anew whether she was under a benefits-qualifying disability for the period beginning on April 11, 2011 to February 6, 2012. Additionally, this matter should be remanded for payment of benefits with the disability onset date of February 6, 2012.

## IT IS THEREFORE RECOMMENDED THAT:

1.     The Commissioner's non-disability finding be vacated;

2.     No finding be made as to whether Plaintiff was under a disability between

22

April 11, 2011 and February 6, 2012, and this case be remanded to the Social Security Administration under Sentence 4 of 42 U.S.C. §405(g) for further consideration of whether Plaintiff was under a disability during this time period;

3.      This matter be otherwise remanded for payment of benefits with a disability onset date of February 6, 2012; and

4.      The case be terminated on the docket of this Court.


January 29, 2016

          s/Sharon L. Ovington       
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).

24